RUTH C. PINKEL (Cal. Bar No. 164470)
Email: pinkelR@sec.gov
COLLEEN KEATING (Cal. Bar No. 261213)
Email: keatingc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>BRETT M. BARTLETT, SCOTT A. MILLER, DYNASTY TOYS, INC., THE 7M EGROUP CORP., CONCEPT MANAGEMENT COMPANY LLC,  AND DYNASTY, INC.,<br><br>　　　　　Defendants. | Case No.  8:23-cv-00765<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## <u>JURISDICTION AND VENUE</u>

1.　　The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Bartlett and Miller resided in this district during the fraud scheme and, on information and belief, are current residents of this district.  Further, defendants Dynasty Toys, Inc., The 7M eGroup Corp., Concept Management Company LLC, and Dynasty, Inc. each had their principal place of business in this district.

## SUMMARY

4.     This civil enforcement action concerns a securities offering fraud perpetrated by Brett Bartlett, his father-in-law Scott Miller, and their entities The 7M eGroup Corp., Dynasty Toys, Inc., Concept Management Company LLC, and Dynasty, Inc. (collectively, the "Dynasty Entities").  From at least June 2018 through May 2020, Bartlett, Miller, and the Dynasty Entities raised at least $20.5 million from more than 1,000 investors nationwide through the offer and sale of promissory notes, "gold contracts," and stock.  Many of these defrauded investors were affiliated with a large church in Illinois.  Bartlett and Miller claimed to share their Christian faith, and represented to investors that Dynasty's business model was family values-based.  When raising investor funds, Defendants claimed that investor capital would be used to fund the purchase of toy inventory for resale, to develop a pre-production gold mine, and – during the COVID pandemic – to purchase and ship face masks to government agencies and other organizations.

5.     Defendants, however, misled and deceived actual and potential investors by making numerous material misrepresentations about the purported success and value of the Dynasty Entities, returns on investment (including promised investor "bonuses" that they knew they could not pay), and the use of investor funds, among other things.  First, Bartlett and Miller, who were the principals and control persons of the Dynasty Entities, misappropriated at least $1.2 million of investor money for their personal use, including expenditures on vacations and other recreational activities, a $15,000-per-month luxury property rental, fees paid to Bartlett's personal counsel, and significant cash withdrawals.  Second, Bartlett, Miller, and the Dynasty Entities misused investor funds to make more than $11 million of Ponzi-like payments to other investors.  And in May 2020, Dynasty Toys sent $21 million in checks, signed by Bartlett, to investors, which "bounced," or failed to clear due to insufficient funds.  Yet throughout the relevant period, Defendants continued to raise money from investors while falsely portraying the Dynasty Entities as a rags-to-riches success story and claiming that the purported success of the Dynasty Entities was owed to divine intervention.

6.     In addition, none of the Dynasty Entities' securities offerings were registered with the SEC, and as a result of Defendants' registration violations, investors were deprived of the critical information that a securities offering registration statement is required to provide for the protection of investors.

7.     Through their conduct, and as further detailed in this complaint, Defendants violated the registration provisions of Section 5 of the Securities Act, and the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

8.     The SEC seeks permanent and conduct-based injunctions, disgorgement with prejudgment interest, and civil penalties against Defendants, and an order barring Bartlett and Miller from acting as an officer of director of a public company under Section 20(e) and 21(d)(2) of the Exchange Act.

## THE DEFENDANTS

9.     Defendant Brett M. Bartlett, age 37, resided in Yorba Linda, California during the relevant period.  He co-founded and co-owned each of the Dynasty Entities.  Bartlett was CEO, president, and a director of Dynasty Toys; the CEO, president, and a director of 7ME; the president and a member of CMC, and the president, secretary, and sole director of Dynasty Inc.  Bartlett has never held any securities licenses and has never been registered with the SEC in any capacity.  Along with Defendant Scott A. Miller, prior to June 2018, Bartlett operated a business reselling goods online. He also participated in online courses for the purpose of coaching others in how to resell goods online.

10.     During the SEC's investigation in this matter, Bartlett asserted his Fifth Amendment privilege against self-incrimination as to all substantive questions during testimony.

11.     Defendant Scott A. Miller, age 63, is Bartlett's father-in-law.  He resided in Yorba Linda, California during the relevant period.  He co-founded and co-owned each of the Dynasty Entities with the exception of Dynasty, Inc.  Miller was vice president, treasurer, secretary, and a director of Dynasty Toys, Inc.; the secretary and a director of 7ME; and the CEO and a managing member of CMC.  Miller has never held any securities licenses and has never been registered with the SEC in any capacity.  Miller was previously the chief operating officer of a large company, and his purported experience taking "a small construction power company from 1 to 100 million in revenue with a valuation of over 140 million" was touted on the CMC website.  Along with Bartlett, prior to June 2018, Miller operated a business reselling goods online.

12.     During the SEC's investigation in this matter, Miller asserted his Fifth Amendment privilege against self-incrimination as to all substantive questions during testimony.

13.     Defendant Dynasty Toys, Inc. is a Wyoming corporation with its

COMPLAINT                                    4

principal place of business in Yorba Linda, California.  Dynasty Toys and its securities have never been registered with the SEC in any capacity.  In July 2020, Bartlett and Miller, while "constituting all of the Board of Directors of Dynasty, Toys, Inc.," resigned all positions and relinquished control of Dynasty Toys to a chief restructuring officer ("CRO").  The CRO resigned in April 2021, leaving the company without management and defunct.

14.     Defendant The 7M eGroup Corp. is a California corporation with its principal place of business in Yorba Linda, California.  7ME and its securities have never been registered with the SEC in any capacity.  In July 2020, Bartlett and Miller, while purportedly "constituting all of the Board of Directors of 7ME," resigned from 7ME and agreed to appoint the CRO, described above, who subsequently resigned in April 2021.

15.     Defendant Concept Management Company LLC is a Wyoming limited liability company with its principal place of business in Yorba Linda, California.  CMC and its securities have never been registered with the SEC in any capacity.  In July 2020, Bartlett and Miller, while "constituting all of the Board of Directors of CMC," surrendered control of the company to the CRO, who resigned in April 2021.

16.     Defendant Dynasty, Inc. is a Wyoming corporation with its principal place of business in Yorba Linda, California.  Dynasty, Inc. and its securities have never been registered with the SEC in any capacity.  Dynasty, Inc. appears to be defunct.

## RELATED ENTITY

17.     Community of Commerce (the "Co-Op") was a Minnesota cooperative association with its principal place of business in Yorba Linda, California.  The Co-Op and its securities have never been registered with the SEC in any capacity.  The Co-Op appears to be defunct and was involuntarily dissolved by the Minnesota Secretary of State in February 2020.

## THE ALLEGATIONS

**A.    The Ponzi-Like Scheme and the Unregistered and Fraudulent Securities Offerings**

18.    Bartlett and Miller, directly and indirectly, exercised day-to-day control over 7ME, Dynasty Toys, and CMC, and, directly and indirectly, controlled and conducted the unregistered securities offerings by each of those entities.

19.    Bartlett, directly and indirectly, exercised day-to-day control over Dynasty, Inc., and, directly and indirectly, controlled and conducted the unregistered securities offering by that entity.

20.     From at least June 2018 to May 2020, Bartlett, Miller, and the Dynasty Entities offered and sold securities in the form of promissory notes, "gold contracts," and stock, raising at least $20.5 million from more than 1,000 investors.

21.    For at least some of the offerings, Defendants used general solicitation to attract prospective investors, including via webcasts and videos, websites, and conferences.  Many of the investors were unaccredited and unsophisticated.

22.    Defendants failed to take reasonable steps to verify investors' accreditation status in connection with each of the offerings.

23.    Defendants kept poor records of the businesses, failed to completely and accurately document incoming investor money, maintained over 200 bank accounts, and commingled funds among bank accounts and entities.

24.    Bartlett and Miller frequently invoked their Christian faith when speaking with or soliciting investors.  They met many of the investors through churches and many investors felt they could trust Bartlett and Miller because they held themselves out as devout Christians.

25.    Bartlett frequently portrayed himself as a devout family man and included photos of himself, his wife and his three young children in informational and solicitation videos distributed to investors and posted online.

1.    **Solicitation of Investors for "Done for You" Notes-June 2018 to December 2018**

26.    In or about June 2018, Bartlett and Miller formed Dynasty Toys and began selling "promissory notes" to investors for the stated purpose of purchasing toy inventory for the upcoming holiday season.

27.    Bartlett and Miller described the so-called "Done For You" ("DFY") program as a group purchase of inventory that Dynasty Toys would make and then resell online before Christmas to generate profits for the company and note purchasers to share.

28.    Bartlett and Dynasty Toys made false and misleading statements during the DFY offering, including the following:

(a)    In the summer of 2018, Bartlett and Dynasty Toys represented in webinars and on a website that investors would receive returns of 8 to 20 percent by January 2019, or in the "worst case scenario," a full return of their principal by March 31, 2019.

i.    Based on Dynasty's past sales, lack of profits and the fact that Bartlett had not yet decided what merchandise would be sold, there was no reasonable basis to project Dynasty would have an 8-20 percent return or a full return of investment.

ii.    A reasonable investor would want to know that the projected return on investment was not based upon actual experience making such returns and would consider Bartlett's purported track record as an important factor in their investment decision.

(b)    The DFY notes offered and sold to investors stated that purchasers were lending money to the Co-Op, and Bartlett and Dynasty Toys represented that investor funds would be used to purchase inventory.

i.    In fact, investors' money was pooled in 7ME's bank account and used, in part, to pay that entity's marketing and operating expenses.

Defendants also misused investment funds to make Ponzi-like payments, e.g., using one investor's funds to pay another investor, and Bartlett and Miller misappropriated some funds for their personal use.

ii.  A reasonable investor would want to know that their funds were being used for marketing and operating expenses and that their funds were being used to pay back other investors as "returns" on investment or otherwise.

(c)  In a video distributed in the summer of 2018, Bartlett and Dynasty Toys claimed they needed to raise $20 million from investors to purchase the amount of inventory that the company was "confident" it could sell by Christmas. Defendants had no reasonable basis for this projection.

i.  Based on Dynasty's past sales, lack of profits and the fact that Bartlett had not yet decided what merchandise would be sold, there was no reasonable basis to project that Dynasty needed $20 million and/or that it could "confidently" sell that amount of merchandise before Christmas.

ii.  A reasonable investor would want to know, before making an investment decision, that the total amount allegedly needed to be raised and the claims that Dynasty was "confident" it could sell this amount of merchandise by Christmas was not based on reasonable information.

(d)  Bartlett and Dynasty Toys repeatedly touted that the company recently had 3 products among Amazon's top 10 bestselling toys.

i.  However, in reality, those products had been sold at a loss in order to temporarily generate high sales volume, which was not disclosed to investors.

ii.  A reasonable investor would view Bartlett's purported track record as an important factor in their investment decision.

29.  Following their unsuccessful 2018 holiday season, the Dynasty Entities had insufficient assets to repay investors' principal and could not pay the 8 to 20 percent returns they had touted.

30.     Moreover, due to their poor financial position in the wake of the 2018 holiday season, Bartlett, Miller and Dynasty laid off employees in their Yorba Linda location in January 2019.

31.     By early January 2019, investors were clamoring for repayments, which later caused Bartlett and Miller to double down by stalling investors' requests for repayments, enticing and lulling investors into keeping their money invested with the Dynasty Entities, and raising additional funds from existing and new investors.

**2.     Dynasty Toys & 7ME Notes-Early 2019 to 2020**

32.     In January 2019, business consultants working with Bartlett, Miller, and the Dynasty Entities urged them to be forthright with investors about the failure of the 2018 holiday season and the financial state of the companies, and to consider placing the entities into bankruptcy.

33.     Bartlett and Miller, however, rejected this suggestion and instead launched a plan to get investors "excited" to keep their money invested with the Dynasty Entities by offering bonuses that they knew or should have known that they could not pay, while concealing the truth about the entities' precarious financial state from investors.

34.     To stave off demand for cash payouts, Dynasty Toys offered bonuses of up to 40 percent to noteholders who accepted inventory or "credits" as payment.

35.     Initially, Bartlett represented to investors that credits could be used to purchase online e-commerce courses or coaching, which courses and coaching was purportedly offered, for a price, to show people how to successfully sell goods online.

36.     Later, Bartlett switched to claiming to investors that they would be able to convert credits into Dynasty Toys stock.

37.     Dynasty Toys also promised bonuses to investors who extended their existing promissory note or rolled their investment into a new note, and at least 30 investors agreed to do so.

38.     Defendants referred to investors who resisted the foregoing options and

asked for their money as "nuclear," and they repaid at least some of them with other investors' money.

39.     To accomplish this, throughout 2019 and into 2020, Dynasty Toys and 7ME raised additional investor funds through the sale of new notes while misleadingly portraying Bartlett and Dynasty Toys as a "rags-to-riches" success story.

40.     The notes, which were issued by Dynasty Toys or 7ME, falsely promised 40 percent returns in as little as six months, even though Bartlett and Miller knew or should have known, especially in light of their money-losing 2018 holiday sales, that their entities were not generating sufficient revenues to pay those returns.

41.     Further, Bartlett and Miller and the Dynasty Entities did not disclose to investors that they were misusing investment funds to make Ponzi-like payments.

42.     To further this fraud and perpetuate the false image of a successful enterprise with satisfied investors, Dynasty Toys employees deleted negative comments in a Facebook group and "blocked" at least some investors who criticized or questioned Bartlett or the company from posting in the Facebook group.

### 3.     Dynasty Toys Stock-Early 2019 to Early 2020

43.     In addition to the notes described above, from approximately early 2019 through March 2020, Dynasty Toys, Bartlett, and Miller continuously offered and sold stock in addition to notes.

44.     When offering and selling Dynasty Toys stock, Bartlett urged current note investors to convert their existing investments into "preferred shares" at $2.50 per share.

45.     To induce conversion – and thereby avoid demands for cash payouts on the previously sold notes – Bartlett and Dynasty Toys promised "conversion bonuses" of 10 to 20 percent, plus annual dividends.

46.     Bartlett also solicited cash purchases of stock from existing and new investors.  The stock certificates were electronically signed by Bartlett and Miller.

47.     In the process of "converting" existing note investors into new stock investments and soliciting new stock investors, Bartlett, Miller and the Dynasty Entities made numerous false and misleading statements and omitted telling investors information that a reasonable investor would consider important in deciding to invest.

### a.     False statements & omissions

48.     In or about March 2019, in a video distributed to investors, Bartlett misleadingly claimed that a hypothetical July 2016 investment in 7ME had increased in value to $387,482 (including "20% annualized return" and "20% bonus for conversion").

49.     Bartlett also misleadingly claimed that, following conversion into preferred shares of Dynasty Toys, the investment would have an "estimated value" of $774,965 at the time of a planned "Reg A+" offering in August at $5 per share and $1,549,930 at the time of an initial public offering, or IPO, at $10 per share within 3-5 years.

50.     In truth, Bartlett and Miller had no reasonable basis to assert that a hypothetical investment in 7ME would have increased in value as they represented.

51.     In fall 2019, Bartlett falsely represented that CMC was going to purchase Dynasty Toys for approximately $120 million.  In reality, CMC lacked the assets to buy Dynasty Toys, Inc. for $120 million.

52.     In February 2020, Bartlett misleadingly claimed that CMC would pay $5 per share to anyone who wanted to sell their Dynasty Toys stock and encouraged investors to purchase more shares "before the price goes above $5" at the end of the month.   He also promised that investors would receive their choice of a 10 percent cash dividend or 20 percent of their share value in additional shares.

53.     In the same video distributed to investors in February 2020, Bartlett told them that this is a "victory parade" and "this is a God & Grit story," and attributed the Dynasty Entities' alleged success to "God giving us what we need, when we need it."

54.     In truth, Bartlett and Miller had no reasonable basis to claim Dynasty

Shares would double in value by the end of the month or that Dynasty had profits available to pay a 10% dividend.

### 4.  Dynasty Toys Inc. Stock-March 2020

55.     On March 6, 2020, Bartlett sent investors a video featuring a slide deck captioned "Dynasty, Inc."  Bartlett referred to "Dynasty" in the video as if it were a single company.  In these materials, Bartlett falsely claimed that Dynasty had experienced "RECORD BREAKING SALES" of "product"; promised a second semi-annual 10 percent dividend in August; touted a "conservative" forecast of "over $300,000,000 in sales" in the next 60-90 days; and claimed a current company value of $226 million.

56.     Near the end of his presentation, Bartlett claimed that "everything happening is a God story" and that his and Dynasty's "running theme" was "God, Grit and Family."

57.     Two weeks later, Bartlett sent an incomplete Private Placement Memorandum ("PPM") offering Dynasty, Inc. stock to investors via email.  In the email, Bartlett invited investors to join him for a later online worship session.  In an accompanying video, he falsely claimed that Dynasty was "thriving" despite the COVID-19 pandemic, promising that Dynasty was going to be in a "strong liquid cash position at the end of all of this."

58.     On information and belief, the issuer of this new offering, Dynasty, Inc. did not have any bank accounts and did not receive any investor funds during this period; however, on information and belief, Dynasty Toys still raised additional funds in connection with the March 2020 videos and PPM.

### 5.  Solicitation of Investors for Gold Contracts-January to April 2020

59.     Starting in early 2020, shortly before the start of the Covid-19 global pandemic, CMC, Bartlett, and Miller offered and sold fraudulent "gold contracts." As set forth below, they made numerous misrepresentations about the (non-existent) gold, their involvement with the pre-production gold mine, and investors' ability to

receive a return on investment.

### a.   Gold Term Sheets

60.   The term sheet distributed to investors promised a 10 percent bonus on their original principal amount and an additional 10 percent bonus on investments greater than $100,000, though Bartlett and Miller knew or should have known that they could not pay these returns.

61.   On information and belief, Miller prepared and had ultimate authority over the contents of the gold contracts and term sheets.

62.   The contracts specified that after 15 months, investors could choose to renew the contract and receive a 2.5 percent bonus.

63.   On information and belief, most investors were motivated by a desire to remain invested with the Dynasty Entities and did not actually expect to take delivery of any gold.

### b.   Bartlett Announces "Mandatory" Buyback of Dynasty Toys Stock in Exchange for "Gold Contracts"

64.   In March 2020, Bartlett announced a mandatory buyback of Dynasty Toys stock and presented "gold contracts" as the only alternative for investors who did not want to sell their shares.  On information and belief, many (if not all) of the "gold contract" purchasers were existing investors who expected, based on Bartlett and Dynasty's representations, to exchange the contract for stock in the future.

65.   A reasonable investor would have viewed the gold contract as a continuation of their investment in Dynasty.

66.   Defendants sold at least 125 "gold contracts," all of which were dated April 1, 2020, after Bartlett announced the mandatory share buyback.

### c.   False statements and omissions

67.   Both Bartlett and Miller controlled and had ultimate authority over the statements on the Co-Op's website.

68.   In January 2020, the Co-Op's website falsely described the Co-Op as

"backed by gold" and stated that it would be using "cutting-edge technology to produce Gold Bullion."   The website exhorted investors and potential investors to "join the movement, join the first ever CoOp backed by gold" and "Let's Turn This into Gold TOGETHER."

69.    The website falsely represented that the Co-Op would "invest in the gold mine production and members will share in the profits."

70.    The website falsely claimed the "Backstory" was simple and that "[w]e recently acquired Gold Ore assets from these mines and will be using this cutting edge technology to produce Gold Bullion."

71.    In a video sent to investors, Bartlett falsely claimed that Dynasty Toys was "backed by gold" and owned "hundreds of millions of dollars of gold assets."

72.    CMC, Bartlett, and Miller failed to disclose key facts to investors about their "relationship" with the mine developer and omitted telling investors information material to their decision to invest, which included the following:

(a)    In August 2019, CMC had entered into an agreement with a third party ("Mining Co.") that gave CMC the option to loan $3 million to Mining Co. to allegedly develop a pre-production gold mine.  The contract provided that CMC would be entitled to 10 percent of Mining Co.'s gross profits after CMC provided the $3 million.

(b)    CMC never provided $3 million to Mining Co.  Mining Co.'s owner had made clear to Bartlett and Miller that at least $3 million was necessary from CMC to initiate mining operations.

(c)    CMC, Bartlett, and Miller never disclosed the above facts to investors.

(d)    Bartlett falsely told investors that Mining Co. was going to merge with Dynasty Toys when no such agreement existed.

COMPLAINT                                              14

**6.      Solicitation of Investors for Face Mask Promissory Notes-At least April 2020 to May 2020**

73.      Around late February 2020, as the Covid-19 global pandemic unfolded, CMC and Dynasty Toys, doing business under the name "Family Face Mask," began selling cloth face masks online.  By the end of April 2020, they owed their mask supplier ("Supplier") more than $4.88 million.

74.      On May 7, Bartlett executed, personally and on behalf of CMC and Dynasty Toys, a credit and security agreement in favor of Supplier in the amount of $7.6 million.  By or around this time, CMC had begun selling promissory notes to investors, purportedly to fund the purchase and shipment of masks.

**a.      Note terms**

75.      The notes offered to investors generally had terms of 30 days (though some were as short as 15 days) and interest rates of 10 to 35 percent.   Many of the notes stated that Bartlett personally guaranteed the investment, and some purported to be secured by accounts receivable or funds held at merchant processors.  These "guarantees," however, were illusory, as set forth below.

**b.      False statements and omissions**

76.      Bartlett, Miller, and the Dynasty Entities lacked sufficient assets to guarantee the Face Mask promissory notes and had insufficient revenues to pay the promised interest.

77.      Further, at no time did Bartlett or CMC disclose the $7.6 million security agreement they had executed in favor of Supplier.

78.      In a video presentation to investors, Bartlett also falsely represented that Family Face Mask had $4.2 million cash on hand as of May 4, 2020.

79.      Actual and prospective investors would have considered it important to know that the Family Face mask operation and the Dynasty Entities lacked the funds to repay them and did not have $4.2 million cash on hand.

80.      A reasonable investor would have wanted to know that the Dynasty

Entities had promised $7.6 million to Supplier through the security agreement.

81.    A reasonable investor would have wanted to know that Bartlett lacked the assets to personally guarantee the notes.

82.    A reasonable investor would have wanted to know that the Dynasty Entities lacked sufficient accounts receivable and/or funds held at merchant processors to secure the notes, and moreover, to the extent that any such assets existed, they had been pledged to secure multiple notes.

**B.    Misappropriation of Investors' Funds for Defendants Bartlett and Miller's Personal Benefit**

83.    Bartlett and Miller misappropriated more than $1.2 million of investor money for their personal benefit, including at least $580,000 transferred to Bartlett's personal accounts; $220,000 to pay Bartlett's personal legal counsel; more than $33,000 on golf, vacation rentals, and cigars; $175,000 in rent, including for a $15,000-per-month 8-bedroom luxury home in Ranch Santa Fe, California for Bartlett's family; and more than $164,000 in cash withdrawals.

84.    In approximately late January 2019, following the unsuccessful 2018 holiday sales season, Bartlett also used $192,500 of investors' funds to purchase a house and property near Nashville, Tennessee in the name of 7ME.

**C.    Ponzi-Like Payments to Investors**

85.    Bartlett, Miller, and their entities used investor money to make at least $11 million in Ponzi-like payments to other investors.

86.    The Dynasty Entities' revenues generated never exceeded their business expenditures.

87.    Thus, the only way that Defendants were able to make these payments to investors was by using other investors' funds.

88.    Throughout the relevant period, Defendants continued to solicit new and additional investments without disclosing that they were misusing investment funds to make Ponzi-like payments.

89.     A reasonable investor would have believed, including based on Defendants' misrepresentations, that payments they received from the Dynasty Entities as "returns" or bonuses on their investment were in fact from profits generated from sales.

90.     A reasonable investor would have wanted to know that they were being repaid with money from other investors and not from actual profits on sales.

**D.      The Collapse of the Fraudulent Scheme and $21 Million in Fraudulent "Re-Payments"**

91.     In late March 2020, Bartlett announced that Dynasty would be purchasing back all investors' stock at $5 per share, purportedly for pandemic-related reasons.  As described above, investors who did not want to participate in the mandatory stock buyback were told that they could roll their existing investments into gold contracts, and more than 100 did so.

92.     Many investors who opted for repayment were sent fraudulent "bad" checks for repayment.

93.     In May 2020, Defendants sent 65 checks totaling more than $21 million to investors drawn on a Dynasty Toys, Inc. bank account ending in 4883, for which Bartlett and Miller were the only signatories.  The checks were written on or about May 1, 2020, with a memo line indicating it was a "cash out" for investors, and were signed by Bartlett.

94.     On May 1, the date upon which the checks were written, the Dynasty Toys, Inc. 4883 bank account had a balance of less than $21,000.

95.     All of the checks bounced due to insufficient funds and by the end of May 2020, the account balance was negative.

96.     In approximately June 2020, after the $21 million in investor "cash out" checks bounced, Bartlett took his family and employees on a two-week "retreat" to the Big Bear, California mountain resort area and spent approximately $20,000 of company funds for expenses.

97.    In July 2020, under pressure from investors and others, Bartlett and Miller, "resigned all positions and relinquished control" of 7ME, Dynasty Toys, and CMC to the Chief Restructuring Officer ("CRO").

98.    The CRO intended to liquidate any remaining inventory and perform a forensic accounting of the Dynasty Entities, but was unable to do so, including due to a lack of cooperation from Bartlett and Miller.

99.    Miller refused to respond to inquiries from the CRO.

100.    Bartlett failed to provide complete bank information to the CRO despite the CRO's follow-up requests.

101.    In or about August 2020, Bartlett stopped providing information and documents to, and communicating with, the CRO.  The CRO resigned his position by April 2021.

**E.    Defendants Offered and Sold Securities**

102.    Each of the unregistered offerings constituted an offer and sale of securities, in the form of notes, stock, or investment contracts. The promissory notes, stock, and "gold contracts" are securities.

**1.    The notes are securities**

103.    As described above, Defendants sold DFY, Dynasty Toys, 7Me, and Family Face Mask notes in order to raise money to fund their business enterprises.

104.    Investors were primarily motivated by the generation of profits when investing, specifically the 8 to 40 percent profit the notes were expected to generate.

105.    The notes were sold to a broad segment of the public including, at least in the case of the DFY notes, through general solicitation to hundreds of investors nationwide.

106.    Dynasty Toys note investors reasonably expected their promissory notes to be investments.

107.    No regulatory scheme or factor significantly reduced the risk of the Dynasty notes, such that a court should not apply the federal securities laws to the

Dynasty Entitles' note offering.

## 2. The stock offerings are securities

108.   Defendants Dynasty Toys and Dynasty Toys, Inc. preferred stock shares offerings (pre and post-March 2020), as described above, constituted an offer and sale of securities.

109.   Defendants offered and sold these shares in order to raise money to fund their business enterprises or to convert existing note investors into stock shares.

110.   The stock issued by Dynasty Toys is a security because the share certificates referred to the shares as "preferred stock."

## 3. The "gold contracts" are securities because they are investment contracts

111.   The gold contract offering constituted an offer and sale of securities, in the form of investment contracts, in that it involved the offer to purchase "gold contracts" that involved: (a) an investment of money; (b) in a common enterprise; and (3) with an expectation of profits to be derived from the efforts of others.

112.   Investors invested money or rolled over previous cash investments in one or more of the Dynasty Entities to purchase the gold contracts.

113.   Bartlett, Miller, and CMC presented the gold contracts as an investment in a pre-production gold mine that would be developed by others.  Investor funds were pooled and the investors' expectation of profits were interwoven with and dependent upon the success of the managers of Mining Co.  Investors expected to receive profits derived from the efforts of Mining Co. in the form of gold and bonuses resulting from the development of the mine.

114.   At other times, Bartlett presented the "gold contracts" as an opportunity to remain invested with the Dynasty Entities, including the option to convert the investment back into Dynasty Toys stock in the future.  As such, "gold contract" investors reasonably expected to profit from the efforts of Dynasty's management in the form of future increases in the stock price.

115.   Further, investors' funds were comingled with investor funds from other parts of the Dynasty Entities' enterprise, and some of those funds were used to make Ponzi payments.  The defendants' ability to repay investors with funds from new investors required a constant influx of investors.

**F.   Materiality of the Defendants' Misrepresentations**

116.   Defendants' misrepresentations alleged above were material because they went to the heart of the investments, including the use of investor proceeds, the Dynasty Entities' purported profitability and valuation, and promised returns.

117.   In addition, a reasonable investor would have wanted to know that Defendants were using investor money to make Ponzi-like payments and that Bartlett and Miller misappropriated investment funds for their personal benefit.

**G.   Bartlett's and Miller's Scienter**

118.   At all relevant times, Bartlett and Miller acted with scienter, or at minimum, were deliberately and consciously reckless, and their unreasonable conduct was negligent.

119.   They founded, owned, and controlled the Dynasty Entities and orchestrated the offerings.

120.   Bartlett and Miller each was a signer on one or more bank accounts used for investor activity and therefore knew, or was reckless in not knowing, that investor funds were being misused and that they were misappropriating investment funds for their personal benefit.  Because they controlled the Dynasty Entities' finances and operations, Bartlett and Miller also knew, or were reckless in not knowing, that they could not pay the returns and "bonuses" being promised to investors.

121.   As a representative example of a misrepresentation made with scienter, or where they were reckless or negligent in not knowing the statement was false under the circumstances, in fall 2019, in connection with Dynasty Toys Stock offering, Bartlett falsely represented that CMC was going to purchase Dynasty Toys for approximately $120 million.  In reality, CMC lacked the assets to buy Dynasty

Toys, Inc. for $120 million.  Bartlett, as the president of CMC and Miller, as CEO and managing member of CMC, and Miller as signatory of its bank accounts, knew or were reckless or negligent in not knowing that their conduct in making representations about CMC's proposed purchase of Dynasty Toys for $120 million, and its ability to make such a purchase, were was unreasonable under the circumstances, and therefore reckless.

122.   As another representative example, in March 2020, in connection with the offering for Dynasty Toys Inc. stock when Bartlett told investors Dynasty was worth $226 million and would achieve $300 million in sales in 60-90 days, Bartlett and Miller knew, or were reckless or negligent in not knowing, that Dynasty was not then worth $220 million, and their conduct in making these statements, under the circumstances, was unreasonable and therefore reckless.

123.   Similarly, in March 2020, also in connection with the offering for Dynasty Toys Inc. stock, when Bartlett said that Dynasty was "thriving" and was in a "strong liquid cash position," Bartlett and Miller also knew, or were reckless or negligent in not knowing that their conduct in making this statement was unreasonable under the circumstances, and therefore reckless.

## FIRST CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase and Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (against all Defendants)

124.   The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

125.   In connection with the purchase or sale of securities, Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc., each misled and deceived investors and prospective investors about (1) the Dynasty Entities' profitability; (2) the use of investor funds; (3) the expected returns on investment, including dividends; (4) the value of the companies; and (5) the amount of cash on

hand.

126.   In addition, Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc. engaged in a scheme to defraud whereby they raised over $20 million and defrauded investors by making and/or disseminating false and misleading statements, misused investors funds by using them to pay for their own personal expenses, and to pay Ponzi-like returns to investors.

127.   By engaging in the conduct described above, Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc., and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

128.   In connection with the gold contracts and face mask promissory notes, defendant CMC made misrepresentations in the gold contracts, term sheets, and face mask promissory notes it issued.  In connection with the solicitation of investors in Dynasty Toys Stock, CMC is also liable for the statements that Bartlett made in its name about its purported plans to acquire Dynasty and to purchase shareholders' Dynasty stock at $5 per share.

129.   In engaging in the conduct described above, Defendants acted knowingly or recklessly.

130.   Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc., with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were

made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

131.   By engaging in the conduct described above, Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc. violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC)

132.   The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

133.   In connection with the purchase or sale of securities, Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC, each misled and deceived investors and prospective investors about (1) the Dynasty Entities' profitability; (2) the use of investor funds; (3) the expected returns on investment, including dividends; (4) the value of the companies; and (5) the amount of cash on hand.

134.   In addition, Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC engaged in a scheme to defraud whereby they raised over $20 million and defrauded investors by making and/or disseminating false and misleading statements, misused investors funds by using them to pay for their own personal expenses, and to pay Ponzi-like returns to investors.

135.   By engaging in the conduct described above, Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or

property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

136. Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC, with scienter, employed devices, schemes and artifices to defraud; with scienter and/or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter and/or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

137. By engaging in the conduct described above, Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act

### (against Defendant Dynasty, Inc., only)

138. The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

139. Defendant Dynasty, Inc., in the offer or sale of securities, engaged in a scheme to defraud (which included misappropriation of investor funds and Ponzi-like payments) by making and/or disseminating false and misleading statements.

140. By engaging in the conduct described above, Defendant Dynasty, Inc., directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of

the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

141.   Defendant Dynasty, Inc., with scienter, employed devices, schemes and artifices to defraud; and, with scienter and/or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

142.   By engaging in the conduct described above, Defendant Dynasty, Inc. violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Bartlett, Dynasty Toys, CMC, Dynasty, Inc., and Miller)

143.   The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

144.   Each of the offerings by Dynasty Toys (stocks and notes), CMC (gold contracts and face mask notes), and Dynasty, Inc. (stock) involved the offering of securities in the form of investment contracts.

145.   None of those offerings were registered with the SEC.

146.   Dynasty Toys was not the issuer of the DFY notes; however, it is directly liable in connection with the DFY note offering because it, through Bartlett, directly solicited investors, and described and promoted the investment opportunity in videos and on a website.

147.   Bartlett and Miller directly and indirectly participated in the offer and sale of the unregistered securities of their respective entities, and were necessary participants and substantial factors in those sales because, among other things, they owned and controlled the issuers, and their bank accounts, and orchestrated their

respective offerings.  Miller and Bartlett both signed the Dynasty Toys stock certificates; Miller prepared the gold contracts and term sheets; and Bartlett signed the face mask notes.  In addition, Bartlett directly offered and sold securities by, among other things, soliciting investors through presentations, calls, and webcasts/videos.

148.   By engaging in the conduct described above, Defendants Bartlett, Dynasty Toys, CMC, Dynasty, Inc., and Miller, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

149.   By engaging in the conduct described above, Defendants Bartlett, Dynasty Toys, CMC, Dynasty, Inc., and Miller violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## FIFTH CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant Scott Miller as a control person)**

150.   The SEC realleges and incorporates by reference paragraphs 1 through 123 above.

151.   Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], any person who, directly or indirectly controls an entity that is liable under any provision of the Exchange Act or any rule or regulation thereunder, shall also be jointly and severally liable with and to the same extent as that entity, unless the controlling

person can establish that he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

152.   As alleged above, Defendants Dynasty Toys, 7ME, and CMC violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder.

153.   Defendant Miller, as the vice president, treasurer, secretary, and a director of Dynasty Toys, Inc., the secretary and a director of 7ME, and the CEO and a managing member of CMC, is a control person of each of Defendants Dynasty Toys, 7ME, and CMC, because he possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of each of Defendant Dynasty Toys, 7ME, and CMC.  Miller oversaw their fundraising activities and disbursement of investment funds.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendant Miller is liable to the SEC to same extent as each of Defendant Dynasty Toys, 7ME, and CMC would be liable for each of their respective violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc., and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and

Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Bartlett, Miller, Dynasty Toys, CMC, and Dynasty, Inc., and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### IV.

Issue an order against Defendants Bartlett and Miller in accordance with Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

### V.

Issue an order against Defendants Bartlett and Miller in accordance with Section 21(d)(5) of the Exchange Act,  15 U.S.C. § 78u(d)(5), permanently enjoining them from directly or indirectly, including, but not limited to, through any entity owned or controlled by either or both of them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer; provided, however, that such injunction shall not prevent Bartlett or Miller from purchasing or selling securities for his own personal account.

### VI.

Order Defendants Bartlett, Miller, Dynasty Toys, 7ME, and CMC, jointly and severally, to disgorge all funds received from their illegal conduct, together with

prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

## VII.

Order Defendants Bartlett, Miller, Dynasty Toys, 7ME, CMC, and Dynasty, Inc. to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  May 2, 2023

*/s/ Ruth C. Pinkel*
RUTH C. PINKEL
Attorney for Plaintiff
Securities and Exchange Commission